# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MURPHY MARINE SERVICES OF DELAWARE, INC., THE THOMAS M. BROWN, SR. 2006 TRUST FBO JOHN M. BROWN, JR., THE THOMAS M. BROWN, SR. 2006 TRUST FBO TERENCE M. BROWN JR., THE THOMAS M. BROWN, SR. 2006 TRUST FBO TIMOTHY M. BROWN, THE THOMAS M. BROWN, SR. 2006 TRUST FBO, THOMAS M. BROWN, JR., | ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 2018-0664-LWW |
| GT USA WILMINGTON, LLC, | ) ) |  |
| Defendant. | ) ) |  |

## MEMORANDUM OPINION

Date Submitted: May 26, 2022
Date Decided: September 19, 2022

Daniel M. Silver & Travis J. Ferguson, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; *Counsel for Plaintiffs Murphy Marine Services of Delaware, Inc., The Thomas M. Brown, Sr. 2006 Trust FBO John M. Brown, Jr., The Thomas M. Brown, Sr. 2006 Trust FBO Terrance M. Brown Jr., The Thomas M. Brown, Sr., 2006 Trust FBO Timothy M. Brown, and The Thomas M. Brown, Sr. 2006 Trust FBO Thomas M. Brown, Jr.*

David A. Dorey, BLANK ROME LLP, Wilmington, Delaware; *Counsel for Defendant GT USA Wilmington, LLC*

**WILL, Vice Chancellor**

Murphy Marine Services of Delaware, Inc. and its stockholders bring this action against GT USA Wilmington, LLC, an affiliate of Gulftainer Company Ltd. For decades, Murphy Marine provided stevedoring services at the Port of Wilmington, a deep-water maritime facility located at the confluence of the Christina and Delaware Rivers in Wilmington, Delaware. The State of Delaware solicited bids to privatize the port in 2017 and selected GT.

Under pressure from the State, the parties negotiated a binding letter agreement for the sale of Murphy Marine to GT. Murphy Marine's stockholders agreed to sell their shares to GT in exchange for the going concern value of Murphy Marine, as determined by a fair market valuation analysis by KPMG LLP. The parties agreed that the valuation would not consider GT's imminent privatization of the port, which would have caused KPMG's analysis to reflect Murphy Marine's liquidation value. The binding letter agreement also required GT and Murphy Marine to subsequently negotiate a definitive purchase agreement.

KPMG prepared and shared with the parties a preliminary pricing assessment of a 100% equity interest in Murphy Marine. GT found the indicated ranges of value untenable. Despite the terms of the binding letter agreement, GT insisted that KPMG not finalize its valuation unless it addressed the risks Murphy Marine faced from port privatization. A heated dispute between GT and Murphy Marine ensued that KPMG wanted no part of.

1

KPMG terminated the engagement before a final valuation was reached, to GT's relief and Murphy Marine's distress. GT felt that it could restart its discussions with Murphy Marine to reach a deal GT found more palatable. Murphy Marine, however, sent GT a draft definitive contract as contemplated by the parties' binding letter agreement. GT rebuffed Murphy Marine, asserting that the binding letter agreement was terminated. Murphy Marine sought recourse from this court.

In Phase One of this bifurcated matter, Vice Chancellor Glasscock determined three issues of contract interpretation. First, the binding letter agreement between Murphy Marine's stockholders and GT represents the entire agreement for the sale of Murphy Marine's stock. Second, the binding letter agreement unambiguously prevented KPMG from valuing Murphy Marine assuming port privatization. Third, the midpoint of KPMG's value range was the parties' agreed-upon method to select a price point.

With those findings as the backdrop, the Phase Two trial was held before me. Left to be decided is whether GT breached the binding letter agreement and if damages should be awarded. Although I conclude that GT did not breach the binding letter agreement by refusing to accept KPMG's pricing analysis as a final valuation, I find that GT breached the binding letter agreement by refusing to negotiate a definitive purchase agreement and repudiated the parties' contract. To the extent that KPMG finalizing its work was a condition precedent to GT's performance, its

2

failure is excused under the prevention doctrine. Murphy Marine is therefore entitled to damages.

During trial, Murphy Marine also presented evidence regarding a motion for contempt it filed against GT. GT used discovery produced by Murphy Marine to compete against Murphy Marine in negotiations with one of Murphy Marine's largest customers. This violated the court's confidentiality order, entitling Murphy Marine to a finding of contempt.

## I.    FACTUAL BACKGROUND

Certain background facts of this case are set out in this court's May 28, 2021 opinion following the first trial in this bifurcated proceeding.[1] Unless otherwise noted, the following facts were found by the court in that opinion, stipulated to by the parties, or proven by a preponderance of the evidence at the second trial in this action.[2] The Phase Two trial occurred on January 6, 7, and 11, 2022, during which two fact witnesses and two expert witnesses testified. Four other fact witnesses testified during the Phase One trial. The parties introduced 424 exhibits, including 25 deposition transcripts, between the two trials.[3]

---

[1] Dkt. 256 ("Phase 1 Mem. Op.").

[2] Dkt. 221 ("Phase 1 PTO"); Dkt. 352 ("Phase 2 PTO"). Where facts are drawn from exhibits jointly submitted by the parties at trial, they are referred to according to the numbers provided on the parties' joint exhibit list (cited as "JX__"). Deposition transcripts are cited as "Phase [] [Name] Dep." Trial testimony is cited as "[Name] Phase [] Tr."

[3] Dkts. 216-17, 346.

3

## A.  Murphy Marine

The Port of Wilmington (the "Port"), a deep-water port on the Delaware River, is the top North American port for imports of fresh fruit into the United States and has the country's largest dockside cold storage facility.[4]  Plaintiff Murphy Marine Services of Delaware, Inc. ("Murphy Marine" or "MMS"), a Delaware corporation, engaged in stevedoring at the Port for more than forty years.[5]  It is a family-owned business purchased in 2006 by John Brown, Jr., a former longshoreman, and three of his cousins through trusts.[6]  Those "Trusts" are Murphy Marine's stockholders.[7]  "Murphy Marine no longer actively operates in the Port."[8]

## B.  GT and Murphy Marine Sign a Binding Letter Agreement.

In 2017, the Diamond State Port Corporation (the "DSPC"), a corporate entity of the State of Delaware and then-operator of the Port, solicited bids for a public/private partnership to develop and operate the Port.[9]  Gulftainer Company

---

[4] *See* Gulftainer, USA – Port of Wilmington, http://www.gulftainer.com/terminals/usa/port-of-wilmington/ (last visited Aug. 22, 2022).

[5] Phase 2 PTO ¶¶ 1, 2.

[6] Brown Phase 2 Tr. 9-10.

[7] The "Trusts" are The Thomas M. Brown, Sr. 2006 Trust FBO John M. Brown, Jr., Trustee of The Thomas M. Brown, Sr. 2006 Trust FBO Terrance M. Brown, Jr., The Thomas M. Brown, Sr. 2006 Trust FBO Timothy M. Brown, and The Thomas M. Brown, Sr., 2006 Trust FBO Thomas M. Brown, Jr.  Phase 2 PTO ¶ 4; Phase 1 Mem. Op. at 1.

[8] Phase 1 Mem. Op. at 2.

[9] Dkt. 231 ("Joint Stmt. of Stip. Facts") ¶ 8; Phase 1 Mem. Op. at 3.

Ltd., a global entity headquartered in the United Arab Emirates and the world's largest privately-owned port operator, formed defendant GT USA Wilmington, LLC ("GT") to submit a bid to the DSPC.[10]  By the end of 2017, the DSPC identified GT as its preferred bidder and GT began to explore an acquisition of Murphy Marine.[11]

On July 6, 2018, GT and the Trusts executed a binding letter agreement (the "BLA") for the sale of Murphy Marine to GT.[12]  GT's then-Chief Executive Officer Peter Richards and Murphy Marine's Chairman John Brown, Jr. (acting on behalf of the Trusts) executed the BLA.  "Murphy Marine is not, itself, a party to the BLA."[13]

Relevant provisions of the BLA provide:

> 1. The [Trusts] hereby agree to sell, and GT hereby agrees to buy or pay . . . an amount equal to a fair market valuation of purchase, 100% of the shares "Shares" of Murphy Marine . . . at the closing.
>
> 2. The price for the Shares shall be their fair market value, which shall be determined by an independent valuation conducted by KPMG who was selected by the mutual agreement of the parties. KPMG has been mutually retained by the parties . . . .
>
> 3. KPMG shall be advised to assume the transaction is between a willing buyer and a willing seller, with neither under any compulsion to buy or sell, but shall be otherwise free to determine the fair market value of the [Murphy

---

[10] Joint Stmt. of Stip. Facts ¶¶ 6-7, 9.

[11] *Id.* ¶¶ 10-11.  The parties' negotiations are described in greater detail in the Phase One Memorandum Opinion.  *See* Phase 1 Mem. Op. at 4.

[12] Phase 1 PTO ¶¶ 36-45.

[13] Phase 1 Mem. Op. at 5.

Marine] Shares at its sole discretion and through whatever valuation method or methods it deems most appropriate. KPMG's decision shall be final and binding upon the parties.

4. KPMG shall be instructed to prepare two (2) valuations: one (1) that considers the impact, if any, on the value of [Murphy Marine] by the presence of that certain unfunded pension liability of [Murphy Marine] . . . (the "Pension Liability Price") and a second valuation that does not consider any such impact (the "Guarantee Price"). The Shareholders shall have the option, in their sole discretion, to receive the Guarantee Price if, and only if, the Shareholders guarantee to indemnify and pay on GT's behalf any actual pension liability that GT may incur after the execution of this Agreement . . . .

6. After executing this Agreement, the parties will work cooperatively to draft and sign a definitive purchase or settlement agreement with customary provisions. If the parties fail to execute such an agreement within 120 days of the date of closure of the Concession Agreement and GT is in receipt of the Approvals, then this Agreement shall be legally binding upon the parties . . . .[14]

## C.  GT and Murphy Marine Engage KPMG.

Also on July 6, GT and Murphy Marine executed an engagement letter hiring KPMG to conduct a valuation of Murphy Marine (the "Engagement Letter").[15] Richards, Brown, and KPMG's Brian Bouchard signed the Engagement Letter on behalf of GT, Murphy Marine, and KPMG, respectively.[16]  The Engagement Letter

---

[14] JX 102 ("BLA") at 1-2; *see also* Phase 1 Mem. Op. at 8.

[15] JX 100 at 1; *see also* Phase 1 Mem. Op. at 9.

[16] JX 100 at 3.

explained that KPMG "would not provide a specific price point in its valuations of Murphy Marine, but rather would provide a valuation range."[17] KPMG's willingness to only provide a range of value was inconsistent with the BLA, which assumed a price point.[18]

The Engagement Letter provided:

> [KPMG] understand[s] that [GT and Murphy Marine] would like us to assist you with a pricing analysis of a 100 percent equity interest . . . in [Murphy Marine] as of April 30, 2018 or other recent pricing date (Pricing Date) established by the [parties] strictly for the [parties'] internal planning purposes related to a potential sale of [Murphy Marine] to GT. No other use is intended or implied.
>
> It is also our understanding that you will consider our findings as one of many factors in determining a range of potential offer/bid prices for [Murphy Marine,] and the transaction price will be determined solely by negotiation between the [parties]. The pricing analysis cannot be used to determine the purchase price. Our analysis is intended to provide a range of the prices of [Murphy Marine,] which is supportable in terms of relevant pricing approaches such as comparisons to sales of other companies, discounted cash flow analyses, or other earnings-based analyses.[19]

The Engagement Letter stated that KPMG's work plan would include examining Murphy Marine's historical operating results, business plans and future

---

[17] Phase 1 Mem. Op. at 4-5 (describing the negotiating history of the BLA and the Engagement Letter); *see* JX 100.

[18] Phase 1 Mem. Op. at 23.

[19] JX 100 at 1.

performance estimates, the underlying assumptions of its business plans, and risk factors that could affect Murphy Marine's future performance.[20] To render a pricing analysis, KPMG would principally analyze the information provided by GT and Murphy Marine.[21] KPMG's deliverables were to include a "draft narrative written report with supporting financial schedules detailing [its] pricing analysis conclusion."[22] After the parties reviewed those initial drafts, KPMG would provide a "finalized narrative report."[23]

### D. Relevant Phase One Findings

In his Phase One decision, Vice Chancellor Glasscock reached three conclusions about the BLA and Engagement Letter that provide important context for the remaining factual findings I make below.

First, the court concluded that the BLA "represents the whole agreement between GT and the owners of Murphy Marine regarding the purchase and sale of 100% of the equity interest in Murphy Marine."[24] The Engagement Letter was not incorporated into the BLA. It supported the BLA but did not alter its terms.[25]

---

[20] *Id.* at 6.

[21] *Id.*

[22] *Id.* at 8.

[23] *Id.*

[24] Phase 1 Mem. Op. at 27.

[25] *Id.* at 18.

Second, the court held that "the BLA unambiguously prohibited KPMG from valuing Murphy Marine assuming privatization of the Port of Wilmington."[26] "Privatization would allow GT to replace Murphy Marine with its own stevedoring operation, ending Murphy Marine's going-concern value as a stevedore service for the Port of Wilmington."[27] Had KPMG's valuation considered the effect of GT's imminent privatization of the Port, Murphy Marine's value would have represented its liquidation value rather than its value as a going concern.[28]

Finally, the court found that "extrinsic evidence supports the midpoint method as the agreed-upon method to select a price point from the range of value KPMG agreed to produce."[29]

### E. KPMG's Valuation Efforts Begin.

KPMG issued data requests to Murphy Marine immediately after the July 6 meeting where the Engagement Letter was signed.[30] It requested, among other things, Murphy Marine's historical and projected financial information and a

---

[26] *Id.* at 27.

[27] *Id*. at 21.

[28] JX 145 ¶ 2; Phase 1 Mem. Op. at 6.

[29] Phase 1 Mem. Op. at 27.

[30] JX 113 at 1.

description of "any meaningful risks that could potentially impair [Murphy Marine's] ability to grow sales and maintain margins on a go-forward basis."[31]

Murphy Marine responded by letter on July 17, answering KPMG's questions and providing the requested financial information along with supporting documentation.[32] Per the terms of the BLA, Murphy Marine did not list port privatization as a risk. It explained that it faced "[n]o meaningful risk for consideration except normal business risk."[33]

On July 18, Murphy Marine provided KPMG with additional information, including Murphy Marine's actual financial performance for the first half of 2018. Murphy Marine explained that it was outperforming its revenue and EBITDA forecasts for the year.[34]

Murphy Marine also provided KPMG with a withdrawal liability estimate prepared by Segal, a benefits and human resources consulting firm, concerning Murphy Marine's share of an unfunded pension liability for the Philadelphia Marine Trade International Longshoremen's Association Pension Fund (the "Pension Fund"). The current market value of the Pension Fund's assets is less than the

---

[31] *Id.* at 2.

[32] JX 124.

[33] *See id.*; Warner Phase 1 Tr. 234-36.

[34] *See* JX 213; Cianciotto Phase 2 Dep. 111-14.

actuarial value of the Pension Fund's liabilities (the "Unfunded Liability").[35]  Under an agreement with the Philadelphia Marine Trade International Longshoremen's Association, Murphy Marine and its affiliate JH Stevedoring Co. are required to pay their attributed share of the Unfunded Liability if, for three consecutive years, their combined annual hours worked is less than 70% of the preceding five-year average (the "Partial Withdrawal Liability").[36]

### F.     GT Raises Privatization with KPMG.

On July 25, 2018, Gulftainer's then-Chief Investment Officer Jesper Boll sent a letter to KPMG and Murphy Marine about Murphy Marine's responses to KPMG's data requests.[37]  GT said that it wished to bring certain "matters into consideration for KPMG's ongoing valuation."[38]  Those "matters" included "a risk exist[ing] in excess of normal business risk" because Murphy Marine "solely derived" its revenue from operations at the Port.[39]  "[A]n exclusive privatisation of the port," wrote Boll, "may materially negatively impact [Murphy Marine's] ability to generate future cash flows."[40]

---

[35] Cook Phase 2 Dep. 57-59.

[36] *Id.* at 64; D'Angelo Phase 2 Dep. 19-23, 49.

[37] JX 128 at 1-2.

[38] *Id.*

[39] *Id.*

[40] *Id.*

Before sending the letter to KPMG and Murphy Marine, Boll circulated it internally at Gulftainer. He described the draft letter as "aim[ed] to regain control of the MMS valuation process."[41]

## G. The August 13 Call

KPMG issued a second set of data requests on July 30, asking Murphy Marine to provide information regarding its 2018 financial performance, forecasting assumptions, and the various risks that could affect Murphy Marine's future cash flows.[42] Murphy Marine provided the requested information on August 3.[43]

KPMG scheduled a conference call with Murphy Marine and GT for August 13 "to gain a better understanding of the risk profile of [Murphy Marine's] projected cash flows."[44] Specifically, KPMG wished to discuss "the risks resulting from the privatization of the Port of Wilmington to the future cash flow generation of" Murphy Marine, the status of negotiations with the union, and Murphy Marine's EBITDA margin forecasts.[45]

In preparation for the call, Boll told Richards that he expected Murphy Marine to argue the effect of port privatization should not "be considered in [KPMG's]

---

[41] JX 126 at 1.

[42] JX 131 at 5.

[43] JX 133 at 1.

[44] JX 137 at 2.

[45] JX 139 at 1.

valuation which should assume a going concern concept."[46] Boll asked whether GT "should . . . still accept" the exclusion of port privatization, noting that it brought "the risk of a higher price but on the other hand the value of [Murphy Marine] would be very little if privatization is fully included."[47] Richards responded: "As per our conversation this morning play the card of the port privatisation but be reasonable. If we want to finish this we should be looking at accepting a value of less than $8M, without screwing them completely."[48]

The August 13 conference call took place later that day.[49] During the call, KPMG asked Brown if privatization might "affect future cash flow generation" of Murphy Marine and whether those risks were "embedded in [Murphy Marine's] forecasts."[50] Brown responded that there "should be more efficiency with privatization."[51] Boll interjected that port privatization should "be considered in relevance to cash flows after year 2" of the valuation.[52]

---

[46] JX 142 at 1.

[47] *Id.* at 1-2.

[48] *Id.* at 1.

[49] *See* JX 141; JX 217.

[50] JX 141 at 2.

[51] *Id.*

[52] *Id.* at 1.

In an email to Richards after the call, Boll reported that Murphy Marine's "lawyer stated that I crossed a line and violated our agreement which was not to consider privatization. Fair point, but tough luck. I had to protect our position. You can then be the one to save their valuation later if needed by giving something back."[53]

## H.     KPMG Issues Its Draft Pricing Analysis, to GT's Chagrin.

KPMG issued a draft pricing analysis of Murphy Marine on August 20 (the "Pricing Analysis").[54]   Relying on discounted cash flow and guideline public company methods, KPMG calculated Murphy Marine's enterprise value to be between $23,801,700 and $28,448,100 and its equity value to be between $21,486,400 and $26,132,800.[55]  After sending the Pricing Analysis, KPMG began preparing a draft narrative report for the parties.[56]

Upon receiving the Pricing Analysis, Boll shared it with Richards, writing "[t]his is not a good report" as it indicated GT would "pay $21-26m for [Murphy Marine]!"[57]  Boll recommended that GT "fight" KPMG's valuation and "claim that KPMG ha[d] misrepresented the mandate" by failing to consider "port privatization

---

[53] *Id.*

[54] JX 144 at 1.

[55] *Id.* at 5.

[56] JX 219.

[57] JX 146 at 2-3.

14

as [GT] had requested" or "at least get the report updated with a privatization scenario."[58]  He cautioned that doing so would "get ugly and the MMS lawyer w[ould] be all over that" so GT needed "to tread carefully."[59]  Alternatively, Boll suggested that GT offer to pay Brown "$10m and take on the pension liability without further recourse," threatening that GT would "fight this and insist on port privatization being fully incorporated which will get ugly and [Brown] will eventually be paid less."[60]

Richards agreed with Boll, exclaiming: "This is not a good report – is a bit of an understatement!!"[61]  Richards instructed Boll to "go back" to KPMG that day and explain why the Pricing Analysis needed to be revised, advising Boll to "phrase it in such [a way] that you are questioning why these things have not been taken into account and request clarification."[62]  He said that going back to Brown should be "a last resort."[63]

Several hours later, Boll emailed KPMG a series of questions about the Pricing Analysis.  He asked, for example, why KPMG did not consider the

---

[58] *Id.* at 3.

[59] *Id.*

[60] *Id.*

[61] *Id.* at 2.

[62] *Id.*

[63] *Id.*

"remaining tenor of commercial contracts and apply appropriate discounts for risk of renewal and in general to apply risk factors implying future cash flows."[64] KPMG's response confirmed that "the risk of renewal and achieving the margins that were provided given the historical performance of the company" had been considered and were "embedded in the company specific premium of our discount rate as well as the multiple selection in the market approach."[65]

Boll also asked KPMG why "the decided privatization of Wilmington port to an exclusive operator" had been "disregarded in the valuation?"[66] In an internal redline draft of KPMG's responses to GT's questions, Bouchard noted "I don't understand what [GT's] point is on this. . . . What does the privatization of the Port have to do with what we are doing?"[67] KPMG subsequently responded to GT that it had taken "a market participant view of the business in that it will operate as a going concern" and under that assumption, "privatization of the port . . . should not affect the outcome of certain contracts or the generation of the future cash flows."[68]

---

[64] JX 154 at 1.

[65] *Id.* at 4.

[66] *Id.* at 2.

[67] JX 145 at 1; *see also* Phase 1 Mem. Op. at 6-7; Bouchard Phase 1 Dep. 161.

[68] JX 154 at 4.

## I. GT Demands that KPMG Consider Privatization.

On August 28, GT sent a letter to KPMG's Steven Cianciotto (copying Brown) stating that, after reviewing the Pricing Analysis, GT "concluded that" KPMG had "not fulfilled [its] mandate.[69] GT emphasized that KPMG had not accounted for port privatization as a risk factor that could affect Murphy Marine's planned performance, which GT described as "a fundamental mistake in approach."[70] GT asked that the "mistake" be "rectified" and that "a new draft report [be] issued after which [they could] discuss the various elements of the valuation with all the parties and [KPMG] c[ould] issue [its] final report."[71]

That afternoon, Cianciotto contacted KPMG's risk management partner for advice: "Gulftainer is questioning our approach because we did not consider that Gulftainer by privatizing the port will have the option to shut down [Murphy Marine]. We valued [Murphy Marine] as a going concern."[72]

Murphy Marine's counsel sent a letter to KPMG later that night, objecting "in the strongest possible terms" to GT's "attempt . . . to change the rules of the parties'

---

[69] JX 152 at 5.

[70] *Id.* at 5-6.

[71] *Id.* at 6.

[72] JX 156; *see also* Bouchard Phase 1 Dep. 168 (testifying that KPMG was not "considering a potential failure of Murphy Marine, because [KPMG] w[as] doing this under a going-concern analysis"); Bouchard Phase 2 Dep. 262-64.

agreement, and thereby bully KPMG into changing its approach to th[e] valuation."[73]

The letter explained that the BLA excluded port privatization from consideration in the valuation and indicated that KPMG had fulfilled its mandate.[74]  It quoted the relevant paragraphs of the BLA.[75]

On August 29, Boll sent another letter to Cianciotto, reiterating GT's position that "port privatization" was not to be "disregarded" in KPMG's valuation.[76]  He closed by saying that GT "c[ould not] permit KPMG to issue its final report until it is fully aligned with the mandate" as described in the Engagement Letter.[77]  KPMG understood Boll's statement to mean that it should not perform further work or issue its final report until the parties' disconnect about KPMG's mandate was resolved.[78] KPMG ceased any substantive valuation work on the underlying engagement at that point.[79]

---

[73] JX 155 at 3.

[74] *Id.* at 4.  Murphy Marine's accountant separately sent a letter to Cianciotto commenting that the long-term growth estimates in the Pricing Analysis and certain EBITA multiples selected should be increased.  JX 150.

[75] JX 155 at 3-4.

[76] JX 159 at 4.

[77] *Id.* at 5.

[78] Bouchard Phase 2 Dep. 315; *see also id.* at 188-89; Cianciotto Phase 2 Dep. 144-46, 156.

[79] *See* Bouchard Phase 2 Dep. 313-14.

Several more letters were exchanged.[80]  In one letter on August 30, Boll asked KPMG to revise its engagement to offer two valuation scenarios: one where port privatization was considered and another where it was not.[81]  KPMG prepared an "addendum" to the Engagement Letter to address that request.[82]

Later on August 30, Murphy Marine's counsel sent a letter to KPMG stating that GT had breached the BLA, "under which GT agreed that KPMG would be free to exercise its discretion in setting the Price for [Murphy Marine's] shares, and that [KPMG's] decision would be final and binding on both parties."[83]  Murphy Marine asked KPMG to "suspend all work on this project and issue no further reports" until Murphy Marine concluded seeking legal recourse or KPMG was told otherwise "by both parties."[84]

## J.    KPMG Withdraws from the Engagement.

KPMG consulted with its Office of General Counsel about the dispute.[85] Bouchard was "advised" to withdraw and given "guidance" on "how to craft" the

---

[80] *See* JX 160; JX 164; JX 165; JX 167.

[81] JX 164.

[82] JX 222; Bouchard Phase 2 Dep. 314-15.

[83] JX 165 at 2.

[84] *Id.* at 2.

[85] JX 143 at 1.

withdrawal letter.[86]

On August 31, KPMG sent a letter to GT and Murphy Marine withdrawing from the engagement.[87] KPMG's letter stated that: "[W]e have learned that Murphy Marine . . . and perhaps Gulftainer intend[] to use the results of our [analysis] to set a purchase price for the shares of [Murphy Marine] that is binding on both parties."[88] The letter explained that KPMG had been unaware of the BLA or the parties' agreement to use its valuation to set a purchase price in the BLA until receiving Murphy Marine's August 30 letter. It said because Murphy Marine (and "perhaps Gulftainer") "had entered into [the engagement with KPMG] under false pretenses," KPMG considered the engagement "to be void" and terminated.[89]

A few days later, Boll updated his colleagues at Gulftainer and expressed his view that GT was "in a good position right now as KPMG pulled out of the conflict," meaning that GT could "start over with John Brown."[90] He said that GT's "party line" would be that "KPMG pulled out as a direct consequence of [Murphy Marine's] lawyers['] threats" and that GT "ha[d] always been willing to pay a fair market price

---

[86] Bouchard Phase 2 Dep. 210, 224.

[87] JX 143 at 3.

[88] *Id*.

[89] *Id.*

[90] JX 170.

20

and the intention [wa]s to agree [on] an amount with [Murphy Marine] when they are ready to be realistic."[91]

## K.     GT Rejects a Draft Stock Purchase Agreement.

On September 2, 2018, the Trusts provided GT with a draft stock purchase agreement, in accordance with Paragraph 6 of the BLA.[92] The draft included a "Base Price" of $26,124,900, representing the midpoint of Murphy Marine's enterprise value range in KPMG's Pricing Analysis.[93] It contemplated several post-closing adjustments to derive a "Transaction Price," including subtracting the amount of Murphy Marine's outstanding debts as of the closing date.[94]

GT rejected the draft purchase agreement. Boll told Murphy Marine's counsel:

> In the joint Engagement Letter both parties defined the Price and Scope of Work Plan precisely so the method of establishing a fair market valuation was clear and defined in the Scope. It is the position of GT that the DRAFT report from KPMG did not fulfill the terms of engagement or the Scope as defined and this was communicated to KPMG and yourselves on several occasions. The fair market valuation of the price in the DRAFT report was inconsistent with GT's interpretation of the Scope and GT explained the inconsistencies to KPMG as an aid to permitting them to correct the DRAFT fair market valuation in a reasonable

---

[91] *Id.*

[92] *See* JX 226.

[93] *Id.* at 12.

[94] *Id.*

manner and so KPMG could consider GT's comments on the DRAFT report for inclusion in its FINAL report. The FINAL report was never completed.[95]

Boll further stated that "GT consider[ed] the BLA to be substantially frustrated and therefore terminated."[96] As a result, he explained, "the draft SPA is irrelevant."[97]

### L. Murphy Marine Ceases Operations and Stops Making Pension Fund Payments.

On January 25, 2019, Chiquita Fresh North America LLC (one of Murphy Marine's largest customers) notified Murphy Marine that it was terminating their relationship and entering into a stevedoring contract with GT.[98] On September 4, Dole Fresh Fruit Company did the same.[99] Murphy Marine could no longer continue to operate profitably after losing its two largest customers and ceased its operations the next month.[100]

Murphy Marine last contributed to the Pension Fund in 2019.[101] The owners of the Trusts estimate that Murphy Marine will become liable for its share of the Unfunded Liability at the end of 2022 and will be required to pay the Partial

---

[95] JX 227 at 2.

[96] *Id.* at 3.

[97] *Id.*

[98] *See* JX 288; JX 291.

[99] JX 330.

[100] Phase 2 PTO ¶ 30; *see* JX 323; JX 324.

[101] *See* JX 391.

Withdrawal Liability. They anticipate that the combined hours worked of Murphy Marine and JH Stevedoring as a control group will be less than 70% of the preceding five-year average for the third straight year.[102]

### M.    This Litigation

Murphy Marine filed this action against GT on September 7, 2018. The complaint alleges that GT breached the BLA (and the implied covenant of good faith and fair dealing) by interfering with KPMG's valuation of Murphy Marine, declining to accept the deal price indicated by the Pricing Analysis, and refusing to proceed in negotiations to finalize a purchase agreement as required by the BLA, thereby repudiating the contract.[103] An amended complaint adding the Trusts as plaintiffs was filed on January 8, 2019.[104]

The trial in this litigation was bifurcated into two phases. The Phase One trial before Vice Chancellor Glasscock addressed and decided "certain discrete predicate issues of contract interpretation only."[105] As described above, the court's May 28, 2021 Phase One post-trial decision resolved three questions of contract interpretation.[106]

---

[102] Cook Phase 2 Dep. 37-38, 64; D'Angelo Dep. 20, 22, 49.

[103] Dkt. 1.

[104] Dkt. 67.

[105] Phase 1 Mem. Op. at 2.

[106] *Id*. at 27 (concluding that (1) the BLA represents the whole agreement between GT and the owners of Murphy Marine, (2) the BLA unambiguously prohibited KPMG from

The Phase Two trial before me addressed whether GT breached the terms of the BLA (or, in the alternative, the implied covenant of good faith and fair dealing) and, if so, whether the plaintiffs are entitled to damages. The Phase Two trial was held on January 6, 7, and 11, 2022. At trial, the parties also presented evidence in connection with a November 24, 2021 motion for contempt the plaintiffs filed against GT.

## II. LEGAL ANALYSIS

I begin my analysis by considering whether GT breached the BLA. I conclude that the plaintiffs proved that GT breached the BLA when it refused to negotiate a stock purchase agreement with the Trusts and repudiated its obligation to buy Murphy Marine's stock. Even if KPMG reaching a final valuation decision for Murphy Marine was a condition precedent to GT's performance, GT remains liable under the prevention doctrine. GT, by interfering with KPMG's work and injecting privatization into its analysis, materially contributed to the lack of a final valuation.

I next assess the plaintiffs' damages. The Trusts are entitled to an award of $21,464,605 in compensatory damages. They are not, however, presently entitled to damages concerning Murphy Marine's share of the Partial Withdrawal Liability.

---

considering Port Privatization, and (3) that extrinsic evidence supports the midpoint method to select a price point from KPMG's range of values). *See supra* notes 24-29 and accompanying text.

24

## A.       Breach of Contract

The plaintiffs' principal claim is that GT breached the BLA.[107] The elements for a breach of contract claim are: (1) "the existence of a contract"; (2) "the breach of an obligation imposed by that contract"; and (3) "damage to the plaintiff" caused by the breach.[108] The plaintiffs bear the burden of proving their breach of contract claims by a preponderance of the evidence.[109] "Proof by a preponderance of the evidence means proof that something is more likely than not."[110]

The Phase One opinion resolved the first element for a breach of contract claim. Vice Chancellor Glasscock found that the BLA was the sole agreement concerning the sale and purchase of Murphy Marine's equity.[111] The remaining two elements—breach and damages—are addressed below.

---

[107] I analyze this claim under Delaware contract law, consistent with the parties' briefing. *See, e.g.*, Pls.' Post-trial Opening Br. 46 (arguing breach of contract under Delaware law); Def.'s Post-trial Answering Br. 12 (arguing no breach of contract due to condition precedent under Delaware law).

[108] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009).

[109] *See Dieckman v. Regency GP LP*, 2021 WL 537325, at *18 (Del. Ch. Feb. 15, 2021), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE).

[110] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *12 (Del. Ch. Sept. 10, 2018).

[111] *See* Phase 1 Mem. Op. at 11-12.

GT Did Not Breach the BLA by Refusing to Accept the Pricing Analysis.

The plaintiffs did not prove that GT breached the BLA by refusing to accept the Pricing Analysis as KPMG's "decision" on the fair market value of Murphy Marine's shares. Paragraphs 2 and 3 of the BLA provide that the "fair market value" of Murphy Marine's shares "shall be determined by an independent valuation conducted by KPMG" and that "KPMG's *decision* shall be final and binding upon the parties."[112] That language is clear and unambiguous.[113] It contemplates that KPMG will reach a single "decision," which means "a determination arrived at after consideration."[114]

The Pricing Analysis was a draft—and labeled as such—that KPMG planned to update into a "draft narrative report" and then a "finalized narrative report"

---

[112] BLA ¶¶ 2-3 (emphasis added).

[113] *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions."); *GMG Cap. Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997))). A party's subjective interpretation is irrelevant. *See, e.g.*, *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006) (explaining that the "true test" of contract interpretation "is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992))).

[114] *Decision*, Merriam-Webster, https://www.merriam-webster.com/dictionary/decision (last visited Sept. 14, 2022).

following an iterative process.[115] KPMG, which was given the "sole discretion" to determine the fair market value of the shares under the BLA, did not believe that the Pricing Analysis was final. Bouchard testified that KPMG "did not complete [its] valuation analysis" and that KPMG's numbers could change.[116]

That is not to say that KPMG failed to analyze the value of Murphy Marine's shares.[117] I have no grounds to conclude that the Pricing Analysis was unreasonable or that the values it indicated were subject to substantial modification with Murphy Marine considered as a going concern.[118] KPMG did, however, intend to issue further written deliverables that could differ from its initial Pricing Analysis. If I considered the Pricing Analysis to be KPMG's "decision" for purposes of the BLA, it is not apparent what the other deliverables would have been. The BLA does not contemplate multiple "decisions."

---

[115] JX 100 at 8; *see also* JX 144 at 1 ("Attached is our draft estimated price range for Murphy Marine Services along with the draft supporting financial schedules."), 3 ("DRAFT – For Discussion Purposes Only."); Bouchard Phase 2 Dep. 287-88; Seitz Phase 2 Tr. 381 (Q: "And would you agree that the pricing analysis constitutes a valuation?" A: "You know, it constitutes a number that can be considered for valuation purposes. It's not – you know, the standard is maybe a complete valuation.").

[116] Bouchard Phase 2 Dep. 222, 226.

[117] *See* Seitz Phase 2 Tr. 379; Waddington Phase 2 Tr. 755-56.

[118] *See, e.g.*, Seitz Phase 2 Dep. 36-37; Waddington Phase 2 Tr. 768 ("I don't have any evidence in this case where KPMG determined whether they were reasonable or unreasonable").

27

The Pricing Analysis was simply not KPMG's final work product. It was a draft subject to change.[119] KPMG had work left to do before its "decision" would be reached. The Pricing Analysis therefore did not satisfy the terms of the BLA and is not "final and binding" on the parties. GT is not in breach of the BLA for refusing to accept the Pricing Analysis to set a price point for Murphy Marine's stock.

> 2. GT Breached the BLA by Refusing to Negotiate a Stock Purchase.

The plaintiffs proved that GT breached the BLA by failing to negotiate a stock purchase agreement with the Trusts.[120] The BLA provides that, after executing the BLA, "the parties will work cooperatively to draft and sign a definitive purchase or settlement agreement."[121] If the Trusts and GT could not agree on a definitive purchase agreement, the BLA would become the operative agreement between the parties, with any additional "standard and customary terms" either party submitted to be arbitrated.[122] The Trusts presented GT with a draft stock purchase agreement

---

[119] Bouchard Phase 2 Dep. 222.

[120] Because the conduct at issue was governed by the BLA and the conduct Murphy Marine alleges harmed it breached the terms of that agreement, I do not reach Murphy Marine's alternative claim for breach of the implied covenant of good faith and fair dealing. *See WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *19 (Del. Ch. Sept. 17, 2010).

[121] BLA ¶ 6.

[122] *Id.*

28

and requested that GT submit to arbitration.[123] GT refused, stating that a "draft SPA [wa]s irrelevant."[124]

GT's refusal repudiated the BLA and its obligation to purchase Murphy Marine's stock.[125] GT told Murphy Marine in its September 3, 2018 letter that GT "consider[ed] the BLA to be substantially frustrated and therefore terminated."[126] Murphy Marine relied on the repudiation, filing this action four days later.[127]

### 3. A Failed Condition Precedent Did Not Excuse Performance.

GT argues that the BLA was voided, excusing its obligation to buy Murphy Marine's stock, because the condition precedent of KPMG completing a valuation of Murphy Marine to determine a final price never occurred.[128] "The existence of conditions precedent 'are ultimately a question of contract interpretation.'"[129]

---

[123] JX 226.

[124] *See* JX 227 at 3.

[125] *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009) ("A repudiation of a contract is an outright refusal by a party to perform a contract or its conditions." (quoting *PAMI–LEMB I Inc. v. EMB–NHC, L.L.C.*, 857 A.2d 998, 1014 (Del. Ch. 2004))); *see also CitiSteel USA, Inc. v. Connell Ltd. P'ship*, 758 A.2d 928, 930 (Del. 2000).

[126] JX 227 at 3.

[127] *W. Willow-Bay*, 2009 WL 458779, at *5 (explaining that "repudiation amounts to a present breach . . . [o]nce the promisee relies on the repudiation . . . by filing suit for damages").

[128] Def.'s Post-trial Answering Br. 1-2, 13-17.

[129] *Thomas v. Headlands Tech Principal Hldgs., L.P.*, 2020 WL 5946962, at *5 (Del. Super. Sept. 22, 2020) (quoting *Casey Empl. Servs., Inc. v. Dali*, 1993 WL 478088, at *4 (Del. Nov. 18, 1993)).

Conditions differ from promises. The latter give rise to a duty to perform. The former are "act[s] or event[s], other than a lapse of time, that must exist or occur before a duty to perform something promised arises."[130]

Although "[t]here are no particular words that must be used to create a condition precedent, a condition precedent must be expressed clearly and unambiguously."[131] Parties' intent to set a condition precedent to performance may be evidenced by "such terms as 'if,' 'provided that,' 'on condition that,' or some other phrase that conditions performance" connoting "an intent for a condition rather than a promise."[132] The absence of such conditioning language "is probative of the parties' intention that a promise be made rather than a condition be imposed, so that the terms will be construed as a covenant."[133]

GT's obligation to negotiate a definitive agreement for the purpose of Murphy Marine's stock was not expressly conditioned upon KPMG first reaching a final valuation decision. Paragraph 6 of the BLA lacks conditioning language. It states

---

[130] *Id.*; *see also* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."); *TravelCenters of Am. LLC v. Brog*, 2008 WL 5272861, at *3 (Del. Ch. Dec. 5, 2008).

[131] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *25 (Del. Super. July 29, 2021) (citations omitted).

[132] 13 Williston on Contracts § 38.16, Westlaw (database updated May 2022) (citations omitted).

[133] *B&C Hldgs., Inc. v. Temperatsure Hldgs., LLC*, 2020 WL 1972855, at *10 (Del. Super. Apr. 22, 2020).

30

that the parties would begin to negotiate a stock purchase agreement upon the execution of the BLA.[134] Reviewing the agreement as a whole, however, it is evident that the parties chose to include conditioning language elsewhere. Paragraph 5 of the BLA states that "GT's duty to buy" was "conditioned upon" enumerated governmental approvals.[135]

### a. The Prevention Doctrine

Even if KPMG reaching a final valuation decision was a condition precedent to GT's performance, the failure of such a condition is excused under the prevention doctrine. "It is an established principle of contract law that '[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'"[136] It is not necessary for the plaintiffs to show that KPMG would have issued a valuation decision "but for" GT's conduct. "It is only required that the breach have contributed materially to the non-

---

[134] BLA ¶ 6.

[135] *Id.* ¶ 5.

[136] *WaveDivision*, 2010 WL 3706624, at *14 (quoting Restatement (Second) of Contracts § 245 (1981)); *see also Mobile Commc'ns Corp. of Am. v. Mci Commc'ns Corp*, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) ("[A] party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent."); 13 Williston on Contracts § 39:3 (4th ed. 1990) ("When a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to its promise to perform, or to the performance of a return promise, the promisor is not relieved of the obligation to perform, and may not legally terminate the contract for nonperformance.").

occurrence. A breach 'contributed materially' to the non-occurrence of a condition if the conduct made satisfaction of the condition less likely."[137]

GT materially contributed to KPMG not reaching a final valuation decision when it instructed KPMG to stop work and insisted that any further work product address privatization.[138] If GT's performance was conditioned upon KPMG issuing a formal valuation, GT was obliged not to interfere with the exercise of KPMG's discretion in reaching that valuation—particularly by injecting port privatization into the analysis, which the BLA forbade.[139] The record demonstrates that GT repeatedly

---

[137] *Snow Phipps Grp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021) (quoting *In re Anthem-Cigna Merger Litig.*, 2020 WL 5106556, at *90 (Del. Ch. Aug. 31, 2020)); *see also WaveDivision*, 2010 WL 3706624, at *14 (explaining that the prevention doctrine does not require proving that the condition would have occurred "but for" the breaching party's conduct, only that such conduct "contributed materially" to the non-existence of the condition).

[138] *See* 13 Williston on Contracts § 39.13, Westlaw (database updated May 2022) ("Refusing to permit one party to perform or ordering it to stop performance may constitute prevention excusing performance.").

[139] *See* BLA ¶¶ 2-3; Phase 1 Mem. Op. at 19-22. At the very least, the BLA includes an implied term requiring the parties to act in good faith and not deliberately or unreasonably prevent KPMG from formalizing its valuation. *See Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (explaining that the implied covenant is "inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipate"); *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (explaining that the parties breached the implied covenant where their "conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms"). GT's conduct would also breach such an implied term.

interfered anyway—despite knowing that its insistence for KPMG to address privatization "crossed a line"—in order to "protect [GT's] position."[140]

GT insisted that "[a] new draft report [be] issued" that corrected what it called KPMG's "fundamental mistake" in excluding privatization as a risk factor that could affect Murphy Marine's performance.[141] GT also demanded that KPMG change the scope of the engagement to consider a scenario inconsistent with the BLA where Murphy Marine went out of business due to port privatization.[142] After Murphy

---

[140] JX 142 at 1 ("[Murphy Marine's] lawyer stated that I had crossed a line and violated our agreement which was to not consider privatization. Fair point, but tough luck, I need to protect our position. You can then be the one to save their valuation later if needed by giving something back."); *see also id.* (instructing CIO Boll to "play the card of the port privatisation . . . without screwing them completely"); JX 146 at 3 ("No discount for or consideration of port privatization as we had requested. . . . We would need to fight this and claim that KPMG has misrepresented the mandate and not considered above factors as demanded. Or at least get the report updated with a privatization scenario."); JX 148 at 2 ("It seems the decided privatization of Wilmington port to an exclusive operator is not considered despite being requested and despite it being officially approved by the Delaware assembly and publicly announced. Why is this matter of fact disregarded in the valuation?"); JX 159 at 4 (explaining that GT had "repeatedly" told KPMG privatization was "not to be ignored").

[141] JX 152 at 6 ("This is a fundamental mistake in approach which we kindly request to be rectified and a new draft report issued after which we can discuss the various elements of the valuation with all parties and you can issue your final report."); JX 159 at 5 ("[W]e cannot permit KPMG to issue its final report until it is fully aligned with the mandate as signed on 6th of July.").

[142] *See* JX 222.

Marine raised the impropriety of GT's request,[143] Boll told KPMG that GT would not "permit KPMG to issue its final report."[144]

GT's actions were the catalyst for KPMG's ultimate withdrawal. Bouchard testified that GT's correspondence indicated the engagement was "getting contentious" and "derailed," leading him to seek risk management advice.[145] KPMG withdrew from the engagement soon after. GT viewed KPMG's withdrawal as a positive development that would allow it to start negotiations over.[146]

Although KPMG's termination letter states that it ended the engagement after learning its valuation would be used to set the transaction price, GT failed to prove that KPMG would not have issued a final valuation decision irrespective of GT's actions.[147] KPMG wished to remove itself from the parties' "contentious" dispute.[148] Bouchard was "advised" to withdraw by legal counsel in a risk management decision and could not say "conclusively" that GT's letters did not contribute to KPMG's

---

[143] *See* JX 155 at 3-5.

[144] JX 159 at 6.

[145] Bouchard Phase 2 Dep. 188-89; *see also id.* 314-23.

[146] JX 170 ("We are in a good position right now as KPMG pulled out of the conflict which means we can start over with John Brown.").

[147] *See Snow Phipps*, 2021 WL 1714202, at *52-53 (explaining that the "party in breach" may prove the prevention doctrine does not apply if "the condition would not have occurred regardless of the lack of cooperation").

[148] Bouchard Phase 2 Dep. 82, 197.

withdrawal.[149]  At the very least, GT made it less likely that KPMG would finalize the valuation, in satisfaction of the BLA's terms, and more likely that KPMG would withdraw.  GT cannot profit from its misconduct.[150]

### b.  Assumption of Risk

The parties did not assume the risk of KPMG's withdrawal in the BLA. "[T]here is no prevention claim where the contract, in effect, authorizes prevention" by allocating the risk of the condition's nonoccurrence.[151]  This assumption of risk exception to the prevention doctrine generally applies in two situations.  The first is when a contract "uses explicit language to authorize prevention."[152]  Courts have recognized explicit authorizing language including "'for any reasons whatsoever,' 'regardless of the circumstances giving rise to such condition,'" or 'nothing [therein] requires' the agreed-upon condition precedent be consummated."[153]  The second is "when contract terms condition the consummation of a transaction upon the approval

---

[149] *Id.* at 196-97.

[150] *T.B. Cartmell Paint & Glass Co. v. Cartmell*, 186 A. 897, 903 (Del. Super. 1936) ("It is a sound principle that he who prevents a thing being done shall not avail himself of the non-performance he has occasioned.").

[151] *Bobcat N. Am., LLC v. Inland Waste Hldgs., LLC*, 2019 WL 1877400, at *6 (Del. Super. Apr. 26, 2019) (citing *Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1256 (D.C. Cir. 1979)).

[152] *Humanigen, Inc. v. Savant Neglected Diseases, LLC*, 2021 WL 4344172, at *12 (Del. Super. Sept. 23, 2021).

[153] *Bobcat N. Am.*, 2019 WL 1877400, at *6 (quoting various federal court decisions).

of the other party, or subject one party to the discretion, satisfaction, or decision of the other party or a third-party."[154]

Neither is found here. The BLA lacks any explicit language whereby the parties assumed the risk of KPMG failing to complete its valuation.[155] The parties intended to use KPMG's range to set a price for Murphy Marine's shares, but the record does not suggest that either party believed doing so violated the Engagement Letter.[156] And although the BLA gave KPMG the discretion to arrive at a price range, the contract did not explicitly or impliedly assign the risk of KPMG failing to complete its work.[157]

---

[154] *Humanigen*, 2021 WL 4344172, at *12.

[155] *See Bobcat N. Am.*, 2019 WL 1877400, at *8 ("[O]nly a specific risk clearly assumed by a party will preclude that party's defensive claim of prevention."); *W & G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F. Supp. 1336, 1341-42 (D. Del. 1989) (finding assumption of risk inapplicable to the prevention argument because nothing in the agreement "states that either party assumed the risk that the conditions would not occur" and such a term could not be implied). GT acknowledges that "neither Plaintiffs not GT made any effort to address, mitigate, contract out or allocate this risk in any way in the BLA." Def.'s Post-trial Answering Br. 46.

[156] *See* Brown Phase 2 Tr. 30; GT 30(b)(6) Dep. 72.

[157] *Compare Cont'l Advisors S.A. v. GSV Asset Mgmt., LLC*, 2015 WL 7720752, at *3, *5 (N.D. Cal. Nov. 30, 2015) (applying Delaware law and determining that the plaintiff "assumed the risk that the condition precedent would not occur for any number of reasons outside of their control" where the contract stated the defendant broker "[wa]s not obligated to compensate" the plaintiff advisor if the transaction was not consummated or if defendant unilaterally rejected the offer); *Humanigen*, 2021 WL 4344172, at *12-13 (holding that the assumption of risk exception to the prevention doctrine applied where the contract expressly conditioned milestone payments upon FDA approval); *see also W & G Seaford Assocs.*, 714 F. Supp. at 1342 ("The agreement did not authorize a party to prevent

36

The contract was silent as to what would happen if KPMG withdrew from the engagement before completing its work; it did not contemplate that eventuality. Nor did the BLA condition the parties' rights and obligations to perform on GT approving KPMG's valuation approach.[158] Because there was no explicit assignment of risk or authorization of prevention in the BLA, and because both parties were subject to the decision of a third party (that withdrew, in part, because of a party's actions), the assumption of risk exception is not applicable.

### 4. GT Is Not Protected by an Impracticability Defense.

An impossibility or impracticability defense also does not excuse GT's performance.[159] That defense may be available under Delaware law where a party demonstrates: "(1) the occurrence of an event, the nonoccurrence of which was a basic assumption of the contract; (2) the continued performance is not commercially practicable; and (3) the party claiming impracticability did not expressly or

---

the conditions from occurring and did not allocate the risk of non-occurrence. Thus, neither party had the right to hinder the happening of the conditions.").

[158] *Compare Robert Wood Johnson Univ. Hosp. at Hamilton, Inc. v. SMX Cap., Inc.,* 2013 WL 4510005, at *4-5 (D.N.J. Aug. 26, 2013) (holding that a claimant "assumed the risk that the conditions precedent will be prevented" where the parties' performance was conditioned on the defendant receiving confirmations or agreements "satisfactory to" or "reasonably acceptable to" the defendant).

[159] *See generally* 13 Williston on Contracts § 77:1, Westlaw (database updated May 2022) ("The law of impracticability was historically known as the law of impossibility. The term 'impossibility,' as used in previous editions of Williston on Contracts and as used in the original Restatement First, Contracts has been replaced with the term 'impracticability' as used in Restatement Second, Contracts, except where the case clearly implicates impossibility.").

impliedly agree to performance in spite of impracticability that would otherwise justify nonperformance."[160]

GT cannot avail itself of this defense. "In all the cases holding that the promisor was discharged from duty by impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the responsible cause of the impossibility or frustration."[161] KPMG was unable to complete its work as a result of GT's actions. GT insisted that KPMG not complete its report without considering the effect of port privatization on Murphy Marine's value. Doing so put in motion a series of events that led to KPMG withdrawing from the engagement.

Furthermore, the three-pronged test is not met at the second step. It remained commercially practicable to perform the contract, but GT sought to use KPMG's withdrawal to begin negotiations anew.[162] The doctrine is therefore inapplicable.

### 5. Murphy Marine Did Not Materially Breach the BLA.

Murphy Marine's mention of port privatization to KMPG does not constitute a material breach of the BLA that could excuse GT's performance. "A party is

---

[160] *Obsidian Fin. Grp., LLC v. Identity Theft Guard Sols., Inc.*, 2021 WL 1578201, at *6 (Del. Ch. Apr. 22, 2021) (quoting *Bobcat N. Am.*, 2019 WL 1877400, at *9).

[161] *Martin v. Star Publishing Co.*, 126 A.2d 238, 242-43 (Del. Oct. 1956) (quoting 6 Corbin on Contracts § 1329); *see Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *10 (Del. Ch. Dec. 15, 2005) ("A party who contributed to the impracticability of performance is not entitled to use impracticability as a defense.").

[162] JX 170.

excused from performance under a contract if the other party is in material breach thereof."[163] "The converse of this principle is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract."[164]

To find Murphy Marine even in "slight breach" of the BLA would go too far. GT repeatedly and willfully insisted that privatization be considered despite the BLA's terms. Its intention was to drive down Murphy Marine's value.[165] Murphy Marine, by contrast, appears to have raised privatization once—during the August 13 call in response to a question from KPMG about whether risks of privatization were embedded in Murphy Marine's forecasts.[166]

The evidence does not support a conclusion that Brown's statement breached the BLA—much less constitutes a material breach. Brown did not need to justify his projections to KPMG with potential positive effects from privatization. In fact, Murphy Marine's forecasted information did not include port privatization in the

---

[163] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *13 (Del. Ch. Jan. 25, 2013).

[164] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *27 (Del. Ch. Mar. 1, 2022) (quoting *Brasby v. Morris*, 2007 WL 949485, at *4 (Del. Super. March 29, 2007)).

[165] *See, e.g.*, JX 142.

[166] JX 141 at 2.

first place.[167]  Brown's actions are far from consequential enough to excuse GT's performance.[168]

## B.    Damages

Because I have found that GT breached and repudiated the BLA, I next consider the plaintiffs' entitlement to damages.  "[T]he standard damages remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*."[169]  "[E]xpectation damages can be established as long as the plaintiff can

---

[167] *See* Brown Phase 2 Tr. 362.

[168] GT set forth little legal support for its argument that Murphy Marine's purported material breach justified its own non-performance.  *See Level 4 Yoga*, 2022 WL 601862, at *27 (remarking that a party's failure to address the five factors set forth in Section 241 of the Restatement (Second) of Contracts, which are useful in determining whether a breach is material, indicated the weakness of its material breach argument).  GT's contention that it "causally linked" the "August 13 breach" to the numbers in KPMG's Pricing Analysis because "KPMG's draft ranges jibe with Plaintiff's Haas valuation and GT's alleged internal numbers (without negative privatization impacts)" does not bolster its position.  Def.'s Post-trial Answering Br. 40.  The Haas valuation refers to a December 23, 2017 valuation of Murphy Marine performed by Haas Business Valuation Services.  JX 23.   Neither the Haas valuation nor GT's internal calculations accounted for port privatization.

[169] *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001); *see also W. Willow-Bay*, 2009 WL 458779, at *4 (Del. Ch. Feb. 23, 2009); *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *32 (Del. Ch. Apr. 29, 2005) ("A party who is the victim of a wrongful repudiation is ordinarily entitled to damages for breach of contract because, in the absence of repudiation, the party would have performed under the contract and would have received the benefits of its bargain."); 24 Williston on Contracts § 64:2, Westlaw (database updated May 2022) ("[C]ontract damages are ordinarily calculated based on protection of the disappointed promisee's expectation interest . . . to secure . . . the benefit of the bargain that he or she made by awarding a sum of money that will place the promisee in as good a position as he or she would have occupied had the contract been performed.").

prove the fact of damages with reasonable certainty."[170]  Such damages "are calculated as the amount of money that would put the non-breaching party in the same position that the party would have been in had the breach never occurred."[171] "Damages are to be measured as of the time of the breach."[172]

The plaintiffs seek two forms of direct damages: (1) the fair value of Murphy Marine's stock; and (2) losses related to the Partial Withdrawal Liability.  "Direct damages are those which follow immediately from the breach or occurrence."[173] They are the "immediate, direct, and proximate result" from the "wrong complained of" and "necessarily result from the injury."[174]

In the alternative, the plaintiffs assert that they have suffered consequential and special damages relating to the Unfunded Liability.  "Consequential damages are those which are reasonably foreseeable, but which do not result directly from the act of a party; rather from the consequences of the act."[175]  They "do 'not flow directly and immediately from the act of the [breaching] party, but only from some

---

[170] *SIGA Techs. Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

[171] *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007) (citations omitted), *aff'd*, 945 A.2d 594 (Del. 2008).

[172] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 17 (Del. Ch. 2003).

[173] *Mass. Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 2929552, at *21 (Del. Ch. July 23, 2010).

[174] *Pharm. Prod. Dev., Inc. v. TVM Life Sci. Ventures VI, L.P.*, 2011 WL 549163, at *6 (Del. Ch. Feb. 16, 2011).

[175] *Mass. Mut. Life Ins.*, 2010 WL 2929552, at *21.

of the consequences or results of such act.'"[176]  Special damages are, in large part,

synonymous with consequential damages.  "[S]pecial damages are those 'which are

the actual, but not the necessary, result of the injury complained of and which in fact

follow it as a natural and proximate consequence in the particular case, that is, by

reason of special circumstances or conditions.'"[177]

### 1.    Fair Value of Murphy Marine's Stock

The most obvious example of direct damages is the Trusts' loss of the fair

value that GT agreed to pay in exchange for Murphy Marine's stock.  The plaintiffs

proved that GT breached the BLA by refusing to negotiate a definitive agreement

for the sale of Murphy Marine's stock and repudiated the BLA.  The Trusts' losses

flow immediately from GT's actions.

### a.    Enterprise Value or Equity Value

Although the Pricing Analysis did not satisfy the terms of the BLA, it is

sufficiently definite to serve as a measure of the plaintiffs' damages.  "The quantum

of proof required to establish the amount of damages is not as great as that required

to establish the fact of damage."[178]  "Responsible estimates of damages that lack

---

[176] *Pharm. Prod. Dev.*, 2011 WL 549163, at *6 (quoting Black's Law Dictionary 352 (5th ed. 1979)).

[177] *Id.*, at *6 (quoting Black's Law Dictionary 354 (5th ed. 1979)).

[178] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom.*, *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

mathematical certainty are permissible so long as the court has a basis to make such a responsible estimate."[179]

The evidence demonstrates that KPMG's Pricing Analysis is a reasonable estimate of the value of Murphy Marine's stock. The Pricing Analysis contains KPMG's preliminary valuation "numbers" and "conclusions."[180] It was prepared following KPMG's review of Murphy Marine's financial data, internal economic and industry research, model preparation, and value analysis.[181] It relied equally on discounted cash flow and guideline public company analyses—both recognized and accepted valuation methods.[182] It was reviewed for mathematical correctness and to ensure the valuation ranges were supportable and complete before it was shared with the parties.[183]

The issue debated between the parties is whether the enterprise value or equity value ranges KPMG provided in the Pricing Analysis are the proper measure of the Trusts' damages (if any). KPMG calculated Murphy Marine's enterprise value between $23,801,700 and $28,448,100 and its equity value (before the Unfunded

---

[179] *Id.*; *see also SIGA Techs.*, 132 A.3d at 1131 (discussing the "established presumption that doubts about the extent of damages are generally resolved against the breaching party").

[180] Bouchard Phase 1 Dep. 46; *see also* Seitz Phase 2 Tr. 376, 396.

[181] Cianciotto Phase 2 Dep. 127.

[182] *See* Waddington Phase 2 Tr. 756-58.

[183] *See* Cianciotto Phase 2 Dep. 129, 131-33; Bouchard Phase 2 Dep. 268; JX 218.

Liability) between $21,486,400 and $26,132,800.[184]  The plaintiffs contend that the enterprise value midpoint of $26,124,900 is the relevant figure.[185]  GT disagrees, arguing that equity value with a midpoint of $23,809,600 is the correct value.[186]

Generally speaking, enterprise value represents the total invested capital of a business.  It includes Murphy Marine's equity value plus its net debt.[187]  Murphy Marine's equity value represents the value to stockholders after subtracting any interest-bearing debt that existed at the time of valuation.[188]  KPMG offset $2.3 million of Murphy Marine's interest-bearing debt in its Pricing Analysis schedules to reach its equity value.[189]

---

[184] JX 144 at 5.  The equity value range is called "Equity Price Before Unfunded Pension Liability."  *Id.*

[185] *See* Pls.' Post-trial Opening Br. 66-67.  The Phase 1 Opinion found that extrinsic evidence supported a finding that the parties intended to use the midpoint of KPMG's Pricing Analysis estimates to select a price point from the range of value that KPMG agreed to produce.  *See supra* note 29 and accompanying text.

[186] *See* Def.'s Post-trial Answering Br. 68-69.

[187] *See* Waddington Phase 2 Tr. 718 ("Enterprise value is essentially the entire value of the business.  And it represents the total invested capital of a business. The invested capital can . . . be comprised of debt and/or equity."); *see also* Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 24 (6th ed. 2022) (describing enterprise value as a term often "ambiguously" or "carelessly" used; explaining that "[o]ne commonly used definition is the total value of the equity in a business (on a market as opposed to book basis) plus the value of its debt or debt-related liabilities, minus any cash or cash equivalents available to meet those liabilities, plus/minus any nonoperating assets/liabilities of the business").

[188] Seitz Phase 2 Tr. 444-48 (discussing equity value as enterprise value minus debt); Waddington Phase 2 Tr. 718 ("The equity value would be the value to the shareholders after subtracting any interest-bearing debt.").

[189] *See* Seitz Phase 2 Tr. 408, 447-48; Waddington Phase 2 Tr. 718-19.

Equity value is the relevant measure by which to assess the Trusts' damages. The Trusts reasonably expected to sell their shares in Murphy Marine to GT in exchange for their fair value.[190] The BLA focused on determining equity—not enterprise—value.[191] KPMG was to set the equity value of the Trusts' shares.[192] I therefore begin my damages analysis with a base of $23,809,600—the midpoint of the equity value reflected in KPMG's Pricing Analysis.[193]

### b. Adjustments

GT argues that because Murphy Marine's assets as of June 30, 2018 were retained and used for the benefit of the Trusts, certain economic benefits from that retained ownership cannot properly be included in a damages award. It asserts that any damages awarded to the plaintiffs must be reduced by more than $6 million to ensure the plaintiffs do not receive a "windfall" from GT's breach.[194] GT's expert,

---

[190] *See* Brown Phase 2 Tr. 251; *see also* JX 100 ("We understand that you would like us to assist you with a pricing analysis of a 100 percent equity interest (the Subject Interest) in [Murphy Marine] as of April 30, 2018."); Phase 1 Mem. Op. at 11 (concluding that "the BLA constituted the entire agreement between the parties with regards to the purchase of Murphy Marine's equity").

[191] BLA ¶ 1 (describing that GT agreed to buy 100% of Murphy Marine's shares in "an amount equal to a fair market valuation of purchase").

[192] *See* Waddington Phase 2 Tr. 718-19; Seitz Phase 2 Tr. 450.

[193] The plaintiffs maintain that GT waived its ability to argue that enterprise value is an inapt measure of the value of Murphy Marine's shares. *See* Pls.' Post-trial Opening Br. 66. But because the evidence demonstrates that equity value is the proper measure of damages, the plaintiffs' waiver argument is irrelevant.

[194] Def.'s Post-trial Answering Br. 70-76. GT describes the $6 million in reductions it seeks as a "setoff." *Id.* But a "set-off" is a "counterdemand which the defendant holds

Edward Waddington of Marcum LLP, opined that the following reductions are appropriate:[195]

| Description | Amount |
| --- | --- |
| Distributions paid to the Trusts by Murphy Marine post-June 30, 2018 | $3,799,624.00 |
| Legal fees Murphy Marine incurred in this litigation | $1,995,506.00 |
| Retained earnings | $546,726.00 |
| **TOTAL** | **$6,341,856.00** |

The plaintiffs' expert, Paul Seitz of Seitz Consulting LLC, opined that any reduction should not exceed $2,344,995.[196]

---

against a plaintiff, arising out of a transaction extrinsic of the plaintiff's cause of action." *CanCan Dev., LLC v. Manno*, 2011 WL 4379064, at *5 (Del. Ch. Sept. 21, 2011); *see also Finger Lakes Cap. P'rs, LLC v. Honeoye Lake Acq., LLC*, 151 A.3d 450, 453 (Del. 2016) ("Set-off is a mode of defense by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part."); 80 C.J.S. *Set-off and Counterclaim* § 5 (2022) ("'Set-off' is a legal or equitable remedy that may occur when two entities that owe money to each other apply their mutual debts against each other."). GT has not asserted a counterdemand against the plaintiffs. Thus, I analyze its argument that damages should be reduced to account for certain positive economic benefits that flowed to the Trusts as one intended to ensure that the damages awarded are "based upon the reasonable expectation of the parties ex ante." *Henkel Corp. v. Innovative Brands Hldgs., LLC*, 2013 WL 396245, at *6 (Del. Ch. Jan. 31, 2013); *see also WaveDivision*, 2010 WL 3706624, at *19-20 (calculating damages by subtracting costs avoided as a result of the breach).

[195] *See* Waddington Phase 2 Tr. 736-38; Def.'s Post-trial Answering Br. 72 (GT's counsel's "electronic whiteboard" reflecting Waddington's testimony); *see also* JX 396 ("Waddington Rebuttal Rep.").

[196] JX 421 ("Seitz Rebuttal Rep.") at 4.

46

i.     *Stockholder Distributions*

Murphy Marine made distributions to its stockholders after June 30, 2018. As noted above, Waddington calculated that Murphy Marine paid a total of $3,799,624 in distributions to the Trusts in 2018, 2019, and 2020.[197] Seitz reduced that figure by (1) deducting $818,824 for a September 2018 distribution; (2) deducting $293,213 in distribution tax liability; and (3) discounting the number to a present value of $2,344,995.[198] Seitz's calculation is demonstrated as follows:

| Year | Whittington-Calculated Distributions | Distributions Before Sept. 30, 2018 | Murphy Marine Tax Liability | Distributions Net of Tax Liability | Present Value Based on KPMG Pricing Analysis |
|------|------|------|------|------|------|
| 2020 | $150,000 | | $0 | $150,000 | $112,350 |
| 2019 | $2,494,907 | | ($278,562) | $2,216,345 | $1,917,138 |
| 2018 | $1,154,717 | ($818,824) | ($14,651) | $321,242 | $315,507 |
| **TOTAL** | $3,799,624 | ($818,824) | ($293,213) | $2,687,587 | **$2,344,995** |

After considering the parties' positions, I adopt Seitz's approach.

Seitz assumed an October 1, 2018 closing date, which is reasonable given that the Trusts presented GT with a draft stock purchase agreement on September 2.[199]

---

[197] *Id.*

[198] *Id.*

[199] JX 226 at 15.

Waddington's use of KPMG's July 30, 2018 valuation date as the economic closing date is not. The only relevant evidence cited is Murphy Marine's draft stock purchase agreement, which provided for a future closing date.[200] The $818,824 of distributions Murphy Marine made before October 1, 2018 will not be subtracted from the plaintiffs' damages because those distributions occurred before any conceivable transaction would have closed.

Seitz excluded $293,213 from the total distributions to address the tax consequences that Murphy Marine's post-October 1, 2018 income created for the Trusts.[201] Waddington refutes this approach because the Trusts would face tax consequences whether a sale of their stock occurred or Murphy Marine's operations continued.[202] But as Seitz articulated in his rebuttal report, a stock sale as contemplated by the BLA would have allowed the Trusts to be taxed at the capital

---

[200] *Id.* at 18. The draft contemplated that Murphy Marine had not paid "any dividends or distributions" before closing but contained a carve-out for distributions "expressly contemplated by the Agreement or as set forth on Section 3.08 of the Disclosure Schedules." *Id.* § 3.08.

[201] *See* Seitz Rebuttal Rep. at 3; Seitz Phase 2 Tr. 403.

[202] Waddington Phase 2 Tr. 727 ("The income that the company generated subsequent to June 30th of '18 does have tax consequences, no different than the proceeds of the sale that would go to the shareholders have tax consequences. So in that basis, they shouldn't be tax-effected in the first place."); *see* Seitz Phase 2 Tr. 403. GT also asserts that Murphy Marine experienced an aggregate loss between June 30, 2018 and "late 2021" such that "no taxes over that period would accrue to the Plaintiffs at all." Def.'s Post-trial Answering Br. 73-74. That statement is unsupported by the record.

gains rate (20%) rather than ordinary income tax rates (a maximum of 37%).[203]

Given this significant tax rate differential and that GT offered no alternative calculation to address it, I decline to deduct the $293,213 in actual tax the Trusts paid in 2018 and 2019 from the damages award.[204]

Seitz discounted the distributions back to 2018 dollars using the 15.5% weighted average cost of capital KPMG computed in the Pricing Analysis. Waddington acknowledged that time value needs to be considered for stockholder distributions taken after September 30, 2018 but did not provide his own calculation.[205] Seitz's approach is appropriate given that it allows for an "apples to apples" comparison to the Pricing Analysis itself, from which the midpoint equity value is drawn.[206]

Accordingly, $2,344,995 will be subtracted from the midpoint equity value.

---

[203] Seitz Rebuttal Rep. at 5; Phase 2 Tr. 409-10 (Seitz).

[204] Any potential uncertainty about whether these taxes should bear on the Trusts' damages is properly resolved against GT as the breaching party. *SIGA Techs.*, 132 A.3d at 1131. The willfulness of GT's breach provides further grounds to resolve any uncertainty against it. *Id.* (explaining that the court may "take into account the willfulness of the breach in deciding whether to require a lesser degree of certainty").

[205] Waddington Phase 2 Tr. 728, 780. Instead, GT advocates for the application of the prejudgment interest rate but provides no reasoned grounds, evidence, or calculation in support. *See* Def.'s Post-trial Answering Br. 74.

[206] Seitz Rebuttal Rep. at 3; Seitz Phase 2 Tr. 404.

ii.     *Legal Fees*

GT next avers that the legal fees Murphy Marine incurred in this litigation must be subtracted from the equity value midpoint.[207]  According to Waddington, the $1.995 million in legal fees incurred and paid by Murphy Marine are a personal benefit to the Trusts.[208]

The plaintiffs' legal fees would not, however, have been incurred but for GT's wrongful actions.[209]  These legal fees are unlike the stockholder distributions, which naturally flowed from Murphy Marine's continued operations as a matter of course. The fees were a result of GT's breach and repudiation of the BLA, which forced the plaintiffs to seek legal redress.

GT's response to that distinction concerns Murphy Marine's standing.  It argues that because Murphy Marine is not a party to the BLA, the legal fees were entirely for the benefit of the Trusts.[210]  That is an oversimplification.  Murphy Marine's initial request when it filed this litigation in 2018 was for specific performance of the sale contemplated by the BLA, to which Murphy Marine was a

---

[207] The plaintiffs have reserved their right to seek legal fees under the bad faith exception to the American Rule.  *See* Pls.' Post-trial Reply Br. n.12.

[208] Waddington Phase 2 Tr. 783-85; Waddington Rebuttal Rep. at 3.

[209] *See* Seitz Phase 2 Tr. 406-07.

[210] Def.'s Post-trial Answering Br. 74; Waddington Phase 2 Tr. 732-33.

necessary party.[211] Murphy Marine subsequently ceased operations and the Trusts continued to seek damages to remedy their loss. Murphy Marine's use of corporate funds in furtherance of that outcome does not necessitate an adjustment to the midpoint equity value as the measure of the plaintiffs' damages.[212]

### iii.    *Retained Earnings*

The final adjustment sought by GT concerns $546,726 in retained earnings that remained on Murphy Marine's balance sheet as of December 31, 2021.[213] The parties' experts agree that those retained earnings have not been distributed and may ultimately be used to wind down Murphy Marine, including to pay remaining salary expenses and advances to JH Stevedoring.[214] Thus, Murphy Marine's current retained earnings will not be subtracted from the midpoint equity value.

*          *          *

---

[211] GT conflates the lack of a reduction from the midpoint equity value and fee shifting under the American Rule, arguing that if legal fees are not deducted, it would "reward Plaintiffs for their counsel fees in an action where fee shifting is not going to happen." Def.'s Post-trial Answering Br. 74-75. GT cites no case law in support of that assertion. By declining to reduce the midpoint equity value by the amount of legal fees incurred to vindicate the plaintiffs' losses, I am not affirmatively awarding fees. The damages award is fixed by and reflects the midpoint equity value from KPMG's Pricing Analysis—a value calculated without regard to any litigation that would follow.

[212] Again, any uncertainty on this issue is fairly construed against GT as the breaching party. *See supra* note 204.

[213] *See* Def.'s Post-trial Answering Br. 75-76; *see also* Waddington Rebuttal Rep. at 2.

[214] *See* Seitz Phase 2 Tr. 405-406; Waddington Phase 2 Tr. 731, 780-82.

The Trusts are awarded $21,464,605 as direct damages for the loss of fair market value that GT agreed to pay in exchange for Murphy Marine's stock. That figure reflects the $23,809,600 equity value midpoint as calculated in the Pricing Analysis less $2,344,995 for distributions Murphy Marine made to the Trusts.

### 2. The Unfunded Liability

The plaintiffs also seek damages related to the Unfunded Liability. Murphy Marine and JH Stevedoring expect to experience a third consecutive year where their combined hours worked falls below 70% of the preceding five-year average.[215] If that occurs, the plaintiffs maintain that the Pension Fund will impose and pursue the Partial Withdrawal Liability.[216]

At trial, Brown testified that his "level of confidence" that a partial withdrawal liability will be assessed is "100 percent."[217] The evidence supports his belief, indicating that the Partial Withdraw Liability is reasonably certain to occur as to Murphy Marine.[218] Murphy Marine stopped contributing to the Pension Fund and

---

[215] *See* Cook Phase 2 Dep. 64; D'Angelo Phase 2 Dep. 20-23, 49. Murphy Marine made its final contribution to the Pension Fund in 2019 as it no longer hired union labor after ceasing operations. *See* JX 391.

[216] Cook Phase 2 Dep. 57-59; D'Angelo Phase 2 Dep. 82-83.

[217] Brown Phase 2 Tr. 114.

[218] *PharmAthene*, 2010 WL 4813553, at *11 ("Under Delaware law, a plaintiff can only recover those damages which may be proven with reasonable certainty.").

JH Stevedoring has never provided union hours worked that would cover Murphy Marine's portion.[219]

The plaintiffs are not entitled to an award of direct damages to address the Partial Withdrawal Liability (and related Unfunded Liability).[220] The plaintiffs submitted evidence intended to demonstrate that GT sought to drive Murphy Marine out of business, thereby causing its hours worked to fall below 70% of the preceding five-year average.[221] But the conduct that Murphy Marine complains of occurred

---

[219] *See* JX 386 at 9-10 (concluding that "a partial withdrawal liability will be triggered as of December 31, 2022" based on reduced total work hours).

[220] GT asserts that to award damages concerning the Partial Withdrawal Liability in addition to damages based on Murphy Marine's equity value would lead to "double counting." Def's. Post-trial Answering Br. 62. The plaintiffs disagree, arguing that the equity value range used to calculate damages does not include any portion of the Unfunded Liability. *See* JX 144 at 5. If I were to award damages for the Partial Withdrawal Liability, further briefing would be warranted given that the parties gave short shrift to this issue in their post-trial briefs. I am not, however, awarding separate damages for the Partial Withdrawal Liability in this decision.

[221] JX 386 at 9; Seitz Phase 2 Tr. 410-14. In support of this argument, the plaintiffs introduced testimony by Seitz regarding his calculation that the hours worked by Murphy Marine or JH Stevedoring combined will fall below 70% of the preceding five-year average, thereby triggering the pension withdrawal liability. GT moved to exclude Seitz's testimony on this issue under Delaware Rule of Evidence 702 on the grounds that Seitz is unqualified to testify on a multi-employer pension fund liability. *See* Def.'s Mot. in Limine (Dkt. 355). I decline to exclude the testimony but instead give it the appropriate weight. *See Beard Rsch.*, 2009 WL 7409282, at *6 ("[A]lthough it is critical in a jury trial for a court to exercise its gatekeeper function in advance of allowing an expert to testify, the importance of addressing issues raised under *Daubert* and Rule 702 before an expert testifies is more attenuated in a bench trial."); *see also Strategic Inv. Opps. LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *12 n.131 (Del. Ch. Feb. 14, 2022) (declining to exclude evidence under Rule 702 but instead giving the evidence "the weight deemed appropriate" by the court). Waddington testified that he was competent to perform the same statutory calculation Seitz undertook. Waddington Phase 2 Tr. 787. I believe that Seitz, as an accountant and business valuator, can capably calculate the numbers of hours worked. I

*after* the BLA was breached.  Murphy Marine's cessation of operations, its control group membership with JH Stevedoring, their reduction of annual hours worked, and the resulting risk of the Partial Withdraw Liability being imposed are not "necessary and usual" results of GT's breach that could give rise to direct damages.[222]

Whether the plaintiffs have proven consequential (or special) damages relating to the Unfunded Liability is more complicated.  Consequential damages are those "reasonably foreseeable or contemplated by the parties at the time the contract was entered into as a probable result of a breach."[223]  A loss "may be foreseeable as a probable result of the breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary

---

do not consider his testimony as that of an expert on pension withdrawal liability, which he admits he is not.  *See* Seitz Phase 2 Dep. 30; Seitz Phase 2 Tr. 415-18, 427.

[222] *Mass. Mut. Life Ins.*, 2010 WL 2929552, at *21; *Henkel Corp.*, 2013 WL 396245, at *5 (citations omitted) ("Direct damages are damages 'inherent in the breach,' the 'necessary and usual result' of the breach, and 'flow naturally and necessarily' from the breach.").

[223] *TVM Life Scis. Ventures VI, L.P.*, 2011 WL 549163, at *6 (quoting Williston on Contracts § 64:16, Westlaw (database updated May 2022)).  As discussed above, I consider the plaintiffs' arguments about consequential damages and special damages to be one in the same given that courts generally treat them synonymously.  *See WSFS Fin. Corp. v. Great Am. Ins. Co.*, 2019 WL 2323839, at *5 (Del. Super. May 31, 2019) (citations omitted) ("Consequential damages, also known as special damages, are those that result naturally but not necessarily from the wrongful act, because they require the existence of some other contract or relationship.  Consequential damages are not recoverable unless they are foreseeable and are traceable to the wrongful act and result from it.  The distinction between direct and consequential damages is the degree to which the damages are a foreseeable and highly probable consequence of a breach.").

course of events, that the party in breach had reason to know."[224]  "A plaintiff may recover consequential damages by showing that 'at the time of the contract the parties could reasonably have anticipated that these damages would be a probable result of a breach.'"[225]

The parties to the BLA were aware at the time of contracting that if GT did not purchase Murphy Marine's shares, Murphy Marine would face the Partial Withdrawal Liability.  The evidence demonstrates that it was reasonably foreseeable that the Partial Withdrawal Liability could result from GT failing to complete its purchase of Murphy Marine's shares:[226]

- Before the BLA was executed, GT met with Murphy Marine and Fred D'Angelo, counsel for Murphy Marine and the Pension

---

[224] 24 Williston on Contracts § 64:17, Westlaw (database updated May 2022) (quoting Restatement (Second) of Contracts § 330).

[225] *Frank Invs. Ranson, LLC v. Ranson Gateway, LLC*, 2016 WL 769996 (Del. Ch. Feb. 26, 2016) (quoting *Desco Corp. v. Harry W. Trushel Constr. Co.*, 413 S.E.2d 85, 89 (W.Va. 1991)).

[226] GT appears to raise a mitigation defense, arguing that it was "certainly feasible for [Murphy Marine] to do something more than simply refuse to continue on its business." *See* Def.'s Pre-trial Br. 59; Def.'s Post-trial Answering Br. 62.  But mitigation is not "a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seem wiser or would have been more advantageous to the defaulter." *W. Willow-Bay*, 2009 WL 4588779, at *8 (quoting *In re Kellet Aircraft Corp.*, 186 F.2d 197, 199-200 (3d Cir. 1950)).  Rather, "[m]itigation is subject to a rule of reasonableness and whether a loss is mitigable turns on the circumstances." *Id.*  Given the size difference between Murphy Marine and JH Stevedoring, I cannot conclude that the Partial Withdraw Liability was avoidable if Murphy Marine ceased operating. *See* Brown Phase 2 Tr. 115.  Nor do I have evidence in the record to support a finding that Murphy Marine did not operate reasonably after GT's breach until it could no longer do so profitably.

Fund, who explained the estimated $9.1 million Partial Withdrawal Liability to GT. Brown noted that without a stock sale, "his family would not be able to absorb this payout."[227]

- The parties thus negotiated the BLA to contemplate a share sale (rather than an asset sale) to avoid leaving Murphy Marine with a substantial Unfunded Liability that "could be avoided by all parties by a stock sale that l[eft] MMS intact and operational."[228]

- The terms of the BLA discusses the need to assess "the impact, if any, on the value of MMS by the presence of that certain unfunded pension liability of MMS to the [] Pension Fund."[229]

- In August 2018 after receiving the Pricing Analysis, Boll described the BLA as "the pension liability letter we signed."[230] GT's outrage at the ranges in the Pricing Analysis caused it to consider whether to offer to Brown that GT "pay him $10m and take on the pension liability without further recourse to him."[231]

- GT's Rule 30(b)(6) representative confirmed that GT understood in 2018 that Murphy Marine ceasing operations could result in withdrawal liability.[232]

- GT sought legal advice regarding "the "potential triggering of unfunded pension liability in anticipation of litigation."[233]

It is reasonably certain that *Murphy Marine* will have to answer for at least a portion the Partial Withdrawal Liability. The problem for the plaintiffs is that

---

[227] JX 69.

[228] JX 43; *see also* JX 42.

[229] BLA ¶ 4.

[230] JX 146 at 3.

[231] *Id.*

[232] GT 30(b)(6) Phase 2 Dep. 87.

[233] JX 385 at Entry 61.

Murphy Marine cannot recover consequential damages for GT's breach. Murphy Marine is not a party to the BLA; it was the subject of that agreement. The plaintiffs do not argue that Murphy Marine was a third-party beneficiary to the BLA. Nor do they provide a legal basis for Murphy Marine to pursue a claim for consequential damages resulting from GT's breach. That leaves the matter of whether the *Trusts* can recover consequential damages.

At present, the Partial Withdraw Liability has not been assessed. The record suggests that the Trusts might not have personal or individual responsibility for that liability in the future. The demand letter for payment sent to Murphy Marine by the Pension Fund states that the "liability and demand extends to the firm(s) which made contributions to the Fund and all trades or businesses under common control as provided in 29 U.S.C. § 1301(b)."[234] That would include members of a control group (i.e., Murphy Marine and JH Stevedoring) but not necessarily individual investors.[235]

---

[234] JX 375 at 2; *see Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1374 (7th Cir. 1992) (explaining that such control group membership is limited to "persons engaged in trades or businesses" to "protect the owners of the corporation from having to dig into their pockets to make good the withdrawal liability of their corporations"). The plaintiffs contend that *Slotky* supports the possibility of a pension fund recovering against an individual stockholder. But the case discusses a pension fund seeking recovery from an individual who could be considered a member of a control group under the relevant federal statute. *Id.* at 1373-74; *see also* D'Angelo Phase 2 Dep. 28-29 (discussing liability in the case of a control group).

[235] D'Angelo Phase 2 Dep. 27-28 (testifying that if company were in a control group, "the liability would exist within the control group, but it would not flow up to the individual stockholders").

D'Angelo testified that he was aware of no circumstances "in the normal course of business" where a company's pension withdrawal liability would "run . . . up to the owners of the entity."[236]

Yet I cannot conclude with any certainty that the Trusts will not ultimately be made to answer for the Partial Withdrawal Liability.[237] How the Pension Fund will proceed is unknown. Recovery is not available where a party's alleged damages are "uncertain, contingent, conjectural, or speculative."[238] It would therefore be premature to grant a damages award to the Trusts or order that GT fund an escrow account.[239] It would also be premature to conclude that the Trusts will never suffer consequential damages relating to the Partial Withdrawal Liability.[240]

---

[236] *Id.* at 27.

[237] The plaintiffs cite to federal precedent indicating the possibility of a "federal interest in disregard of the corporate form to impose liability" for claims involving pension benefits protected by ERISA. *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002); *accord Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 460-61 (7th Cir. 1991); *Kock Refining v. Farmers Union Cent. Exchange, Inc.*, 831 F.2d 1339, 1344 (7th Cir. 1987).

[238] *Callahan v. Rafail*, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001).

[239] The plaintiffs ask that GT be ordered to fund an escrow to cover any future liabilities. *See* Pls.' Post-trial Opening Br. 72-73. Certain of the plaintiffs' arguments in support concern whether GT would be able to fund a future damages award. GT has moved to exclude evidence regarding its financial condition, arguing that such information is "confidential" and "private." *See* Def.'s Mot. in Limine ¶ 1. It cites to precedent concerning whether that information might affect a jury's determination of liability—but this is a bench trial. *See supra note* 221. I see no grounds to exclude that evidence and therefore deny the motion. In any event, I have not relied upon or discussed GT's financial condition in this decision.

[240] This decision should not be read to preclude the Trusts from later seeking consequential

### 3. Pre-judgment and Post-judgment Interest

"In Delaware, prejudgment interest is awarded as a matter of right."[241] Pre-judgment interest is awarded to "compensate plaintiffs for losses suffered from the inability to use the money awarded during the time it was not available."[242] Generally, pre-judgment interest "accumulates from the date payment was due."[243] Here, pre-judgment interest on the Trusts' damages began to accrue as of September 2, 2018 when GT refused to negotiate the stock purchase agreement and repudiated the BLA.[244]

The Court of Chancery generally looks to the legal rate of interest, as set forth in 6 *Del. C.* § 2301, as the "benchmark" for the appropriate rate of pre- and post-judgment interest.[245] That legal rate of interest—5% over the Federal Discount Rate—"is a mere guide, not an inflexible rule."[246]

---

damages if they become liable for all or some of the Partial Withdrawal Liability.

[241] *Citadel Hldg Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

[242] *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008) (quoting *Trans World Airlines, Inc. v. Summa Corp.*, 1987 WL 5778, at *1 (Del. Ch. Jan 21, 1987)).

[243] *See Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011).

[244] JX 227.

[245] *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988); *see Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *12 (Del. Ch. July 25, 2003); 6 *Del C.* § 2301 (providing the legal rate of interest is 5% over the Federal Discount Rate).

[246] *Id.*

The Federal Discount Rate as of September 2, 2018 was 2.5%, making the legal rate of interest 7.5% at the time of GT's breach. When the court "award[s] the legal rate of interest, the appropriate compounding rate is quarterly."[247] Compounding interest better reflects the financial realities of conducting business and serves the interest of putting injured parties back into the position they were before the breach.[248] The plaintiffs are therefore entitled to pre- and post-judgment interest at a rate of 7.5%, compounded quarterly, from September 2, 2018 to the date of payment.

## III. MOTION FOR CONTEMPT

At trial, the plaintiffs presented evidence regarding their Motion for Contempt.[249] They ask that GT be held in civil contempt for violating the Order Governing the Production and Use of Confidential and Highly Confidential Information entered by this court on October 16, 2018 (the "Confidentiality Order").[250]

---

[247] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del. Ch. May 20, 2004).

[248] *See Brandin v. Gottlieb*, 2000 WL 1005954, at *28-29 (Del. Ch. July 13, 2000); *Onti, Inc. v. Integra Bank*, 751 A.2d 904, 926-29 (Del. Ch. 1999) (discussing factors to consider when contemplating interest awards such as "the indisputable realities of the financial market," the "relative financial sophistication of the parties" and "common sense").

[249] *See* Dkt. 316.

[250] Dkt. 35.

"The remedy of civil contempt serves two purposes: to coerce compliance with the order being violated, and to remedy injury suffered by other parties as a result of the contumacious behavior."[251]  Court of Chancery Rule 70(b) authorizes the court to find a party in contempt for the failure "to obey or to perform any order."[252]  "A cardinal requirement for any adjudication of contempt is that the order allegedly violated give clear notice of the conduct being proscribed."[253]

## A.        Whether GT Violated a Court Order

"When an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way."[254]  "A party petitioning for a finding of contempt 'must establish the contemptuous conduct by a preponderance of the evidence.'  If that burden is carried, 'the burden then shifts to the [purported] contemnors to show why they were unable to comply with the order.'"[255]

---

[251] *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1181 (Del. Ch. 2009).

[252] Ct. Ch. R. 70(b).

[253] *Mother Afr. Union First Colored Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992).

[254] *TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 640, 644 (Del. 2022).

[255] *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 2180240, at *22 (Del. Ch. June 16, 2022) (quoting *TransPerfect Glob., Inc. v. Pincus*, 2022 WL 1763204, at *8 (Del. June 1, 2022)).

1.     The Confidentiality Order

The plaintiffs produced documents to GT over the course of this litigation, including information reflecting Murphy Marine's revenue and financial information for various customers. The plaintiffs designated certain of that discovery "Highly Confidential" pursuant to the Confidentiality Order when producing it to GT.[256] Given the terms of the Confidentiality Order, Murphy Marine had reason to expect that GT would use the information solely for purposes of this litigation.

The Confidentiality Order provides:

> Discovery Material shall be used solely for purposes of this Litigation and shall not be used for any other purpose, including, without limitation, any business or commercial purpose, or any other litigation or proceeding; provided, however, that the foregoing shall not apply to Discovery Material that is or becomes part of the public record.

GT was bound by and had clear notice of the Confidentiality Order. The Order had been stipulated to and proposed by the parties to this litigation, including GT, whose counsel executed it.[257]

---

[256] Dkt. 316 Exs. 2-4.

[257] Dkts. 33, 35.

## 2. GT's Actions

Throughout 2019, Murphy Marine and GT competed for business in the Port.[258] By June 2019, Dole and GT were discussing stevedoring rates.[259] On June 10, 2019, GT's then-Chief Executive Officer Eric Casey wrote to Richards and GT's in-house counsel Greg Iannarelli about discussions with Dole, noting that GT would need to review "the actual delta between what we are asking and what we think MMS was charging."[260]

Iannarelli and GT's Director of Finance Tony Casadei worked to "deconstruct[]" the costs Dole had previously provided to GT.[261] By June 26, Iannarelli told his colleagues that he believed the "best deal" GT could achieve with Dole was $271.29 per box.[262] That figure reflected stevedoring costs of $16,279,327.[263] But on June 28, Casadei reported that Dole's cost structure had been "validated" to include stevedoring costs of $18 million flat.[264]

---

[258] *See* Casey Phase 2 Dep. 32, 101-02.

[259] JX 408 at 1-2.

[260] *Id.* at 1.

[261] JX 410.

[262] JX 413.

[263] *Id.*

[264] JX 415 at 2.

On July 1, Iannarelli sent a representative of Dole a marketing piece with a three-column chart purporting to reflect potential cost savings if Dole contracted with GT for stevedoring and terminal services.[265] The first two columns set Dole's stevedoring costs at $13 million—the amount that Dole had reported to GT.[266] The third column set Dole's costs at $18 million (i.e., Casadei's "validated" figure), which GT described as "another variation of estimated costs."[267]

On August 1, Casey emailed Richards and Iannarelli in preparation for a meeting with Dole, including the same three-column chart Iannarelli had sent to Dole the prior month.[268] Casey explained that the $18 million figure reflected in the third column of the chart had been created by combining GT's $16.3 million estimate for stevedoring and maintenance and repair costs with "under $2M in markup" intended to "simulate [MMS's] $18M in revenue scenario."[269] Casey emphasized, "**NOTE**: Our $18,000,000 [estimate] was based upon reviewing the rent to DSPC and [Iannarelli] seeing a balance sheet from discovery placing Murphy [Marine's] revenue at $9,000,000 for half the year."[270]

---

[265] JX 399 at 2-3.

[266] *Id.*

[267] *Id.*

[268] JX 326 at 1-2; *see also* JX 417.

[269] JX 326 at 2.

[270] *Id.* (emphasis in original).

Iannarelli acknowledged that the $18 million estimate was "[p]artly" from a balance sheet Murphy Marine produced in discovery that put its half year revenue at $9 million.[271] While testifying as GT's Rule 30(b)(6) deponent, Iannarelli said that he had given Casey "an approximation number" to avoid Casey having "direct visibility from any of the discovery documents."[272] At trial, Iannarelli insisted that he told Casey and Richards after the August 1 email was sent that Murphy Marine's discovery was not used to arrive at the $18 million scenario.[273]

Nevertheless, the weight of the evidence supports a finding that GT violated the Confidentiality Order and is in civil contempt. GT used information that Murphy Marine produced pursuant to the Confidentiality Order for a business purpose. That violation was not a technical one. Rather, it is more likely than not that GT used a competitor's obviously confidential information to negotiate with a then-current Murphy Marine customer against Murphy Marine.[274]

---

[271] GT 30(b)(6) Phase 2 Dep. 261-63; *see* Iannarelli Phase 2 Tr. 563-65.

[272] GT 30(b)(6) Phase 2 Dep. 261-63.

[273] Iannarelli Phase 2 Tr. 569-72.

[274] *Cf. Fitzgerald v. Cantor*, 1999 WL 66525, at *5 (Del. Ch. Jan. 13, 1999) (noting the concerns at play "when a competitor is seeking information by discovery"). None of the arguments GT raises to the contrary are persuasive. For example, GT points to Iannarelli's testimony that the $18 million figure was estimated internally by GT rather than based on Murphy Marine's discovery. *See* Def's. Opp. to Mot. to Contempt ¶¶ 24-25. That testimony is uncorroborated. Both Richards and Casey were deposed after Iannarelli, yet GT did not elicit testimony related to Casey's August 1 email. Neither Casey nor Richards appeared at the Phase Two trial. Moreover, GT's internal model building is not necessarily exclusive of its use of data derived from Murphy Marine's discovery. I also do not credit

65

## B. The Appropriate Sanction

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders."[275] "[S]anctions for civil contempt should be directed towards coercing compliance with the order being violated and remedying the injury suffered by other parties as a result of the contumacious behavior."[276] "In selecting contempt sanctions, the court is "obligated to use the least possible power adequate to the end proposed."[277]

Murphy Marine was injured by GT's violation of the Confidentiality Order and sought vindication through the Motion for Contempt. There is no obvious remedy that the court can grant to fully redress that harm. The plaintiffs have asked that GT be ordered to pay the fees and expenses they incurred in connection with the Motion for Contempt. I believe that sanction is measured, appropriate, and not

---

GT's argument that Casadei (who did not testify or submit an affidavit or declaration) rounded up from $16.3 million to reach a flat $18 million—which just happened to be identical to the amount provided in Murphy Marine's discovery. *See* Def's. Opp. to Mot. for Contempt ¶ 21. It is more likely that the $18 million estimate was reached by doubling the $9 million half-year figure Iannarelli saw during discovery, consistent with Casey's August 1 email. JX 326.

[275] *Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at *2 (Del. Nov. 6, 2007) (TABLE).

[276] *Aveta Inc.*, 986 A.2d at 1188.

[277] *In re TransPerfect Glob., Inc.*, 2019 WL 5260362, at *13 (Del. Ch. Oct. 17, 2019), *aff'd in part, rev'd in part sub nom. TransPerfect Glob., Inc. v. Pincus*, 278 A.3d 630 (Del. 2022).

punitive under the circumstances.[278] The plaintiffs' counsel shall submit an affidavit outlining their fees and expenses in connection with the Motion for Contempt within 14 days of this decision.

## IV. CONCLUSION

For the reasons stated in this post-trial opinion, I find that GT breached the BLA. The Trusts were harmed as a result and are entitled to an award $21,464,605 in damages, plus pre- and post-judgment interest as set forth above. The Trusts are not presently entitled to relief in connection with the Unfunded Liability. Finally, I find that GT is in civil contempt and must pay the plaintiffs' fees and expenses incurred in bringing their Motion for Contempt.

The parties are directed to incorporate the court's rulings into a stipulated form of final judgment within 30 days. If the parties disagree on a form of order, they shall submit competing orders along with letters identifying their disagreements.

---

[278] *See, e.g., Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2021 WL 4264046 (Del. Ch. Sept. 17, 2021) (ORDER) (holding counsel in contempt for violation of a confidentiality order and ordering the payment of reasonable fees and expenses); *see also McDonald v. Cooper Tire & Rubber Co.*, 186 F. App'x 930, 932 (11th Cir. 2006) (affirming the district court's order imposing sanctions on an attorney who disclosed deposition testimony to unauthorized persons in violation of a protective order); *Lunareye, Inc. v. Gordon Howard Assocs., Inc.*, 78 F. Supp. 3d 671, 676 (E.D. Tex. 2015) (sanctioning the plaintiff for disclosure of information in violation of a protective order); *see also In re TransPerfect Glob.*, 2019 WL 5260362, at *15 (granting a sanction that included all legal fees "in connection with the prosecution of the contempt motion").